## SIMONS v. FIRST NAT. BANK IN BRONTE, TEX. et al.

### No. 9035.

Circuit Court of Appeals, Fifth Circuit.

Dec. 7, 1939.

Rehearing Denied Jan. 15, 1940.

Lyndsay D. Hawkins, of Breckenridge, Tex., for appellant.

J. M. Wagstaff and Ellis Douthit, both of Abilene, Tex., and Geo. T. Wilson, of San Angelo, Tex., for appellees.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

G. A. Simons sought a declaratory judgment touching his right to $4,963 on special deposit with First National Bank in Bronte, Texas, which was also claimed by H. O. Wooten, and asked a recovery of it. Wooten asserted his claim to the fund, and the Bank disclaimed any interest, asking only a fee for its attorney for bringing in the fund. The court after hearing evidence awarded the money to Wooten, charging the costs of litigation, including the fee for the Bank's attorney, against Simons. Simons appeals.

The important facts are established by written contracts. The conflicting testimony about understandings outside the writings, whether Simons furnished proper oil well casings, and whether the drilling under the first contract was abandoned or merely suspended prior to July 22, 1937, is not of controlling importance. The contracts, with their circumstances, are as follows:

In Coke County, Texas, there was believed to be an unproven oil field, a large acreage was under oil leases, and there was a general desire to put down a test well. Homer E. Ogden had 6,000 acres under leases about to expire for want of

development. He surrendered 2,400 acres to the lessor Rawlings, obtaining an extension as to the rest, and Rawlings leased the 2,400 acres to Simons; and on March 20, 1937, Simons made a written contract with Ogden under which Simons deposited $7,000 with the Bank to be held by it not subject to check, "against contract for drilling well on Rawlings Ranch, and to be released by agreement of the parties hereto when said well is completed, to them or upon their order or heirs or assigns." The well was to be drilled by Ogden to a depth of 3500 feet, unless oil or gas in paying quantities was found at a less depth, when the deposit was to be surrendered to "Ogden or to his heirs or assigns." Simons agreed to deposit further monies when a stated depth was reached, and to furnish necessary well casing, approved by Ogden as to size and quality. The Bank was to be held harmless. On March 29, 1937, Ogden, without consulting Simons, borrowed of Wooten $5,000, and as security agreed in writing to give a mortgage on the drilling rig and tools and to "assign to the second party (Wooten) the sum of $5500 of the deposit made in the First National Bank of Bronte, Texas, to be paid over to the second party when same becomes due and payable to the first party under the terms and provisions of said contract between Simons and first party"; and Ogden also agreed to assign to Wooten, (apparently as a bonus), 320 acres of described oil leases. On the same day Wooten notified the Bank of the assignment. On April 2 Simons, at Ogden's request, gave the Bank a written authority to charge against the deposit a note for $2,000 and interest which Ogden was borrowing from the Bank. By May 18, 1937, Ogden had got the well down about 600 feet. Due to Ogden's want of funds, and to losing a reaming tool in the well and probably in part to defects in the casing, the drilling ceased, Ogden being absent in another State. Simons came on the scene, met Wooten and learned his connection with the matter, and sought to agree with him what should be next done. They reached no agreement. On July 22, 1937, Simons, independently of Wooten, made a written contract with Ogden which recited that Ogden was wholly unable to continue drilling or complete the well or perform his contract, and they desired to rescind the contract and permit Simons to withdraw the deposit in bank subject to the Bank's right to have its note paid, and

therefore they agreed that the contract of March 20, 1937, is hereby abrogated and annulled, that Simons might withdraw his deposit, take possession of his casing in and at the well, and use Ogden's rig and tools for further drilling, without prejudice to the liens on them, and that otherwise neither should be under any further obligation under the contract of March 20. There was an addendum signed by both: "I (Simons) agree to start well as soon as I can work all details on rig and tools and money is released and drill same to contract depth 3500 feet or paying well at lesser depth." Two or three days later Simons saw Wooten and informed him of this and asked if he would take the deposited money and complete the well and Wooten said he was not in that business. Wooten, however, did not foreclose his mortgage on the rig and tools. Matters so stood, Wooten refusing to let the Bank pay Simons, until on October 11, 1937, Simons brought the present suit for the deposit against Wooten and the Bank. On October 28, 1937, Simons made a written contract with one W. A. Heap, who already had oil lease interests in the vicinity, to transfer to him 1,600 of the 2,400 acres held by Simons, Heap to take possession of the rig and material on the ground and at his own cost and expense to complete the well to 3,500 feet. The well if successful was to belong wholly to Heap. There was no reference to Ogden's contract of March 20, 1937. Heap, without conference with Simons, got Ogden, who was associated in his oil interests, to take charge of the drilling, and later Ogden and Heap again went to Wooten, who helped to finance them, and the well was eventually completed, disappointing everyone by being a dry hole.

Wooten contends that all that was done was one enterprise, that everybody was trying to get down a test well, that he put more money into it than anyone else, that Simons deposited this money in the Bank to secure the test well, and having gotten the well, the money ought not to go back to him, but to Wooten. The District Court so held. We do not think the rights of the parties can be so generally disposed of, but depend on the effect of the contracts above recited. This money originally belonged to Simons. It was to become Ogden's only when and if he drilled a well to completion under the contract of March 20, 1937. Ogden did not do this. Even if Simons

was partly at fault in the quality of the casing he furnished, these two settled all matters between them by the contract of July 22. As between them that contract wholly abrogated the contract of March 20 and entitled Simons to take his money back, subject only to the Bank's rights. The Bank charged Ogden's note against the deposit, leaving the balance in dispute.

Wooten, of course, was not bound by the settlement between Simons and Ogden. But he was not the assignee of the entire contract. He had not taken it over from Ogden and bound himself to perform it. He merely had as security for a debt an assignment of $5,500 out of Ogden's pay when and if Ogden became entitled to it. The contract of March 20 was not a purely personal one, for it twice mentions Ogden's assigns. Probably Wooten for his own protection could, when Ogden renounced performance, have assumed to carry out Ogden's obligations and thus become entitled to the deposit. He was given this opportunity by Simons, and declined. After doing so, he had no further right to detain the deposit in the Bank. When several months later Simons brought this suit, Simons was clearly entitled to a return of his money.

He has not forfeited his right by anything that has since occurred. He has had no transaction at all with Wooten. He made a new trade for the drilling with Heap, the contract with Ogden being wholly at an end. Under this new contract Ogden was to furnish no money, but Heap was to get two-thirds of Simons' holdings, 1600 acres, including the well if successful. Under Ogden's contract Simons had retained all his holdings, and the well. Ogden's rig and tools were used by Heap, but Ogden had consented to that in the contract of July 22. Wooten had a mortgage on them which he could have foreclosed but did not, doubtless because he wished the well as much as anyone, since he had acquired from Ogden at least 320 acres of the leases whose value depended on the test. When Heap gave Ogden written authority to do the drilling for him, no reference was made to the contract of March 20, but only to the contract Heap had with Simons. When on Feb. 1, 1938, Heap sought aid of Wooten, they made an independent contract in great detail, without the slightest allusion to any former right on Wooten's part against the well. It was therein agreed that if there was production Wooten was to have a one-fourth interest in the well, and 160 acres surrounding it. On March 17, 1938, Wooten by another written contract agreed to finance Heap to a completion of the well. This contract made express reference to Heap's contract with Simons, and stated that Ogden was drilling under Heap's direction. It provided that if the well was a producer, the well and the 160 acres around it should belong wholly to Wooten. Since the well and 1600 acres were to belong to Heap in case of success by the terms of his contract with Simons, he could so agree with Wooten. But if Wooten was, as he now tries to claim, really carrying on the old contract of March 20, the well and land would be Simons. All that was done after October 28, 1937, was clearly done on the basis of the contract with Heap of that date and without any reference to or effect upon the contract of March 20. Simons' right to the deposited money was not affected thereby. He is entitled to this money, and Wooten should bear the Bank's expense and the costs which were occasioned by his unjustified claim. The cause is reversed and remanded with direction to enter judgment accordingly.

Reversed with direction.